## Shelmire's Appeal.

1. R. and J., brothers, were in partnership; the interest of R. was sold by the sheriff, and purchased by J., who afterwards treated the property as if it were partnership property. *Held*, that this was evidence that the purchase at sheriff's sale had been abandoned.

2. R. having died, J. afterwards frequently acknowledged his liability to account to R.'s estate; agreed to two amicable referees, &c. This was a continuing admission of liability to account so as to suspend the running of the Statute of Limitations.

January 2d 1872. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Appeal from Nisi Prius, No. 260, July Term 1867.

The appeal in this case was by David Shelmire, and Ann E. Shelmire his wife, administratrix, &c., of L. Rex Peters, deceased; the said David Shelmire being also guardian of the minor children of said deceased. In Equity.

The bill in this case was filed in the District Court of Philadelphia by the appellants on the 6th of March 1866, against Jacob Peters, and after answer and replication, was removed into the Supreme Court under the Act of April 6th 1867 (Pamph. L. 838), on the 1st of June 1867.

The bill set out:

1, 2. That the decedent and defendant, in or about 1854, were partners in several omnibus lines in Philadelphia.

4, 5. That the decedent died June 21st 1857, leaving a widow, the plaintiff, to whom administration of his estate was granted, and two minor children; that the partnership continued until the de-

(281)

cedent's death, when it was agreed between the defendant and the administratrix, that the defendant should continue to act as if the partnership continued, and no account was then made.

6, 7. That under an act incorporating The Citizens' Passenger Railway Company, that company in July 1858 purchased the omnibus lines running on their route for $44,000, of which $25,000 was paid by 1000 shares of the stock of the company, and the balance paid in cash.

8, 9, 10. That under an act incorporating the Girard College Passenger Railway Company, that company purchased the omnibus lines of the parties running on their route for a large sum of money, the amount of which the plaintiff did not know; and that after the sale the defendant had a large amount of the partnership property; that the defendant kept the books of the partnership, received moneys paid to it, hired the omnibuses, &c., sold the horses or exchanged them at a profit, and had rendered no account, &c.

11. That in the year 1860, the plaintiffs and defendant united in an amicable reference to Jacob P. Snyder and John Gay, for the settlement of their accounts, as a family settlement, and that defendant produced before the referees account-books and other writings, &c., conducive to an adjustment, and that after proceeding before the referees until May 27th 1861, they made a partial report, finding a balance of $22,038.37 due the firm, "subject, nevertheless, to the approval of David Shelmire;" a further reference to Jacob P. Snyder and W. W. Juvenal was then agreed upon; they proceeded in the performance of their duties, and in the month of November 1865, made a report showing a balance of $23,951.96, one-half of which they reported belonged to the estate of L. Rex Peters. (The accounts and reports were annexed to the bill.) The defendant then refused to submit further to the referees, and the reference "wholly fell."

12. The defendant had lately claimed that under a sale under executions against L. Rex Peters, he bought his interest in the partnership, but the plaintiff averred that the purchase had been made with funds of the partnership, with the understanding that the partnership should not be affected by it.

The prayers were for an account; a transfer of the stock of the railway companies or account for it at its market value; for a declaration that a valuable part of the investments in the proceeds of the partnership property belong to the plaintiff, and to produce books, &c.

The defendant answered June 2d 1866, that the partnership with his brother, the decedent, continued until November 2d 1855, when all the interest of the decedent was sold by the sheriff under sundry writs of fi. fa., and bought by the plaintiff for $110, and that the decedent thereafter ceased to have any interest in the

[Shelmire's Appeal.]

partnership; that at the sheriff's sale the firm property was not worth more than $12,000 or $15,000, and had been increased by the defendant's own means so as to be worth, at the time of the sale to the railway companies, $44,000. He denied any agreement with Mrs. Shelmire that he should continue to act as if the partnership existed, and averred that long before the death of L. Rex Peters, the whole property belonged to himself; that on the death of his brother he assured his widow that he would not allow her to want, and had contributed " to her support for a considerable time, but not on the footing of a contract, and only out of good feeling towards the family of his deceased brother ;" that the accounts, &c., had always been open for inspection of the administratrix, and no account had ever been demanded. The Citizens' Railway Company paid the defendant as set out in the bill, but it was for his own exclusive property ; his brother's estate had no interest in it. The Girard Railway Company paid the defendant nothing for omnibus property or for anything else. He admitted that he submitted the books for examination at various times to the persons named in the bill, but afterwards withdrew them; he averred that the statements and the exhibits are incorrect.

Examiners had been appointed in the case who took a large amount of evidence.

In the Supreme Court the case was referred to E. Coppee Mitchell, Esquire.

The facts in the case and the questions raised will sufficiently appear in the master's report and the opinion of the Supreme Court.

The master reported :—

* * * " On the first day of January 1852, Jacob Peters, the defendant, and Levi Rex Peters, his brother, were in partnership, owning and running several lines of omnibuses in the city and county of Philadelphia, each owning one-half of the partnership-property and being upon terms of exact equality as to the profits and losses. * * * This partnership continued up to November 2d 1855, at which time it is alleged by the defendant, a sheriff's sale of the interest of Rex Peters took place under executions upon judgments against him individually, and it was bought by the defendant, who paid for it the sum of $110, and thereupon became sole owner of all the partnership-property. Rex Peters died June 21st 1857, leaving a widow and two minor children. * * * The plaintiffs deny that there was any sheriff's sale sufficient to divest the title of Rex Peters, and say that the partnership continued without change up to the death of Rex Peters— and that after his death, the defendant agreed that he should continue to act as though the partnership continued, should in his own way manage the affairs of the omnibus lines, and exercise a

[Shelmire's Appeal.]

very large discretion as to the time and manner of disposing of the partnership effects for the benefit of all the parties interested. The omnibus lines which had belonged to the partnership were sold by the defendant to the Citizens' Passenger Railway Company, who paid him therefor the sum of $44,000 in cash or its equivalent, July 1st 1858. Two attempts have since been made to settle the matters in dispute by reference to friendly arbitration; these references extended from 1860 to 1865, but both have failed. * * *

"It was contended, on behalf of the defendant, that the plaintiffs' claim is barred by lapse of time. * * * The partnership certainly was dissolved by the death of Rex Peters, which took place nearly nine years before suit was commenced, and this delay should be accounted for. Pending the reference, the defendant filed, by leave of court, a plea of the Statute of Limitation. It cannot, however, be said that the plaintiffs were sleeping upon their rights, and were guilty of *laches*. The delay is sufficiently explained by the fact set forth more fully hereafter, that the settlement of these partnership accounts was actually in progress before arbitrators of the parties' own choosing—first, Mr. Gay and Mr. Snyder, and afterwards Mr. Juvenal and Mr. Snyder, almost continuously from 1860 to 1865. That the defendant joined in these references is averred in the bill and not denied in the answer, and is clearly proved in the printed evidence. Besides, the defendant admitted frequently, from 1857 to 1865, the right of Rex Peters's representatives to an account, and promised to pay what was found to be due, when the account was made.

"The real question in the case is that of the alleged sheriff's sale. On the first day of November 1855, it is admitted that the partnership was in existence. The burden lies upon the defendant to show affirmatively that there was a sale, *sufficiently valid in all its requirements*, to transfer his brother's title in the partnership property to him. If he fails to do this, the right to an account cannot be denied. * * *

"The defendant's allegation is that on the 2d of November 1855, all Rex Peters's right, title and interest in said firm was sold by Samuel Allen, sheriff, under sundry executions against him, and bought by defendant for the sum of $110, which sum he paid to the sheriff out of his own proper moneys; and thereby all interest of Rex Peters in said firm ceased, and from that time he had no interest therein."

The master then recapitulates the evidence as to the sheriff's sale.

"There is no doubt that there was a general reputation of a sale to Jacob Peters. Fourteen witnesses testified before the examiner, eleven of whom speak of the sale. Only *one*, William Hicks, says he *was present*—but he cannot say who was the purchaser.

[Shelmire's Appeal.]

Three of the witnesses say that it was sold under a judgment of William Hicks, but no such judgment appears in evidence. Several of the witnesses seem to have derived their knowledge from the sheriff's handbills of the sale, one of which has been put in evidence by the defendant. But in all this there is not a single line of *direct* evidence that Jacob Peters purchased his brother's interest at sheriff's sale except Jacob Peters's own declarations. It is left to be inferred. In connection with this, there is evidence of declarations by Rex Peters, in his lifetime, which seem to make the main strength of the defence; they are therefore to be carefully examined, and are set out at length. Four witnesses testify to conversation with him, as follows: Mr. Wood says: 'After the sale, Rex Peters told me, at various times, he had no interest in the business. He told me that if he had so many thousand dollars—I don't recollect what the amount was—he would go into the business with Jacob Peters again.' Mr. Beamer says: 'He (Rex) told me that he had nothing to do with the stage line, that he was out, and that Jacob was the proprietor.' Mr. Carman says: 'He (Rex) made the remark that he would be like Phœnix, and also said that at that time he had nothing to do with the lines which were running. I have heard him mention repeatedly that he had no connection with the lines that were running.' Mr. Miller says: 'After the sheriff's sale, I had reason to inquire particularly whether Rex had anything to do with the omnibus concern. He said he had nothing to do with it, and didn't want to.' It was also proved that about the time of the alleged sheriff's sale, several of the omnibus-coaches, which had been lettered outside 'L. R. and J. Peters,' were repainted, and the lettering changed to 'J. Peters, Jr.' * * * The defendant attempted to prove that from the date of the alleged sale, Rex Peters ceased to exercise control as a partner in the business—but in this I think he has failed. * * * The evidence offered by the defendant on the question of the sheriff's sale is entirely circumstantial, and it is remarkable that, even taking in the declarations of Rex Peters, which form so strong a link in the chain, there is not discoverable in the whole of it any direct, positive testimony to sustain the defendant's allegation of a sheriff's sale to him of his brother's interest in the partnership property; still, it points strongly to that conclusion.

"To meet and rebut that conclusion, the following points were urged by the plaintiffs : There was no change in the books of the partnership at the time of the alleged sale, and afterwards. William Megonegal, the only clerk of the omnibus business, who had the charge of the books, says : 'The books were continued after the sale in the same manner as they were before." * * * Rex Peters, after the alleged sale, started a couple of coaches, to run from the city to Laurel Hill and the Falls of Schuylkill, on his own account.

[Shelmire's Appeal.]

These coaches were kept in the yard, and the horses were fed in the stables which had belonged to the partnership, and which the defendant says then belonged only to him.

"After the time of the alleged sale, it was the habit of the defendant to pay to Rex Peters 'money to live on,' and it was charged to his individual account, in the books of the omnibus business; and after his death, these payments were continued to his widow. The evidence does not show the amount paid to him, but Mr. Jarvis C. Carman, who was employed in the business by defendant, in several positions of confidence, testifies: 'My orders were to pay her $20 a week, for Mr. Jacob Peters. I presume she received $20 a week, up to the time she married Mr. Shelmire.' In passing, it is proper to advert to the fact, that the defendant, in his answer, explains that he did freely and generously contribute to the support of the widow, but avers that he did so 'not on the footing of a contract, and only out of good feeling towards the family of his deceased brother.'

"But the chief reliance of the plaintiffs is upon the admissions of the defendant, made verbally to several witnesses, and, more strongly still, by his conduct in referring his books to arbitrators, for a settlement of the partnership accounts, upon the basis of a continuing partnership, up to and including the time of the sale to the railway company. Admissions are shown to have been made by the defendant at various times, up to 1865, which consisted in expressions of intention and promises by him to pay the amount shown to be due by settlement of the books of the business. The evidence on the subject of these references to arbitration is important, and has been, therefore, critically examined. There were two references: The first to John Gay and Jacob P. Snyder, the time of the beginning of which does not appear in evidence, probably some time in 1860, and which ended in the finding of a conditional and qualified award, May 27th 1861. The second reference was to William W. Juvenal, Esq., and Mr. Jacob P. Snyder, which ended in an award, finding the sum of $11,975.98, as due the estate of L. R. Peters, by the defendant, which award was signed by both arbitrators, but was afterwards repudiated by Mr. Snyder. This latter reference covered a period of time extending from 1862 to the latter part of 1865. It is not important at this stage of the cause to inquire what these awards were, or how these references failed to settle the matter—they are of value *now* only in showing the conduct of the defendant, as bearing on the question of the ownership of the property in dispute. Mr. Juvenal, who was examined at length, and who, besides being one of the arbitrators in the second reference, had, as mutual friend and counsel for both parties, advised the first reference, and was conversant with the whole matter, speaks clearly to this point. He says the defendant called upon

him and gave assent to the first reference; and afterwards it was proposed that he and Mr. Snyder should examine the books and accounts, and report upon them—and both parties having acceded to this, the defendant sent the books and papers to his house; that the defendant always stated that he desired the accounts to be settled between them as partners continuing; and that he was willing to pay whatever a just settlement of the accounts would show was due. This evidence is substantiated by other testimony on the same subject, and is not contradicted by any evidence in the cause.

"Now starting with an admitted partnership, and the burden of proving the divesting of Rex Peters's title, and the vesting of it in defendant, lying upon the defendant, the question is, has he done so?

"That there was a sale of some kind may be said to be proved; the time and place and the price paid are shown, but every one who can recollect the sale has forgotten who was the purchaser, and, as stated before, there is no direct evidence that defendant was the purchaser. But admitting that he was, still his case is not sufficiently made out. The question remains, was it a *valid* sale? Did it divest the title of Rex Peters and vest it in the defendant? The defendant's own evidence shows that the sale took place after the sheriff was out of office, in a private office in Commerce street, which seems to have been shared between the ex-sheriff and Alderman Mitchell; no return appears to have been made to the court of a sale, and the ex-deputy of the ex-sheriff seems yet to have writs of execution against L. R. Peters in his possession. Nothing was sold beyond the interest in the partnership property, and it would have been natural and decidedly more proper to have sold it on the premises, where purchasers might have seen the partnership stock, and known what they were bidding for. The price too was very small; only $110 for a half interest in a business that is shown to have been worth $20,000 a few years earlier, and $44,000 a few years later, and it does not appear that the firm were indebted. Mr. Hicks, under whose execution defendant claims that the sale was made, got his money not from the sheriff but from Mr. Heebner, to whom he transferred his judgment. There is also evidence that the bills of advertisement of this sheriff's sale were taken down; one witness followed the poster and took them down; and it is in evidence that the defendant was at least privy and consenting, if not active in their being taken down. These facts lead to the suspicion that there was about this sale some radical defect, which rendered it invalid. It is not improbable that there was sufficient ground upon which Rex could have applied to have the sale set aside, or could have successfully contested its validity at the time, but all inducement to do so, and all necessity of doing so for his

protection, was removed by the reiterated declarations of the defendant that he never meant to take advantage of that sale to claim the whole partnership property.

" I do not think the defendant has succeeded in showing such a valid sale by the sheriff to him as would transfer to him his brother's title to his share of the partnership property. * * *"

The master, amongst other things, recommended that the defendant be ordered to account. Exceptions were filed before him to his report. He disallowed the exceptions.

The case was argued at Nisi Prius before Sharswood, J., who dismissed the bill *pro formâ*.

The plaintiffs appealed to the court in banc, and assigned for error the decree dismissing the bill.

*D. W. Sellers*, for appellants.

*W. L. Hirst*, for appellee.

The opinion of the court was delivered, January 16th 1872, by

SHARSWOOD, J.—That there was a sheriff's sale of the interest of L. Rex Peters in the copartnership at one time existing between him and his brother Jacob, we think altogether incontrovertible, and there is sufficient evidence in the answer supported by other testimony, that Jacob was the purchaser at that sale.

We can discover no inherent vice in the sale itself, which could render it ineffectual to pass the title, and no reason to hold that the creditors of L. Rex Peters could have successfully attacked it for fraud. But we think that there was ample evidence to support the conclusion that it was abandoned by Jacob, and that the partnership between him and his brother soon after, if not immediately, returned to and flowed in its former channel. If this were so, it would not be necessary for the creditors of L. Rex Peters to break down the sheriff's sale, in order to reach and levy upon his interest. It is a confirmation of this, that on evidence of the sale was preserved. The executions were without any endorsement of levy—they were never returned—no bill of sale was executed by the sheriff. All the writing that appears is an entry by the sheriff upon his cash-book, of the receipt of a sum sufficient to pay the costs, without stating from whom. This is followed by the undoubted fact that no change was made in the books of the firm, but on the contrary, sums paid to L. Rex Peters out of the proceeds of the business, were charged against him as before in his individual account on those books. It is true that his name was painted out from some of the coaches, and he declared on several occasions that he had nothing to do with the business. Declarations ought not to avail much against facts. There are declarations by Jacob Peters to the contrary. But the most significant

.[Shelmire's Appeal.]

and persuasive evidence upon this point is, that after the death of his brother, Jacob continued to make payments to his widow from the proceeds of the business and charge them in the books. Upon the bare question, of whether there shall be a decree to account, we have nothing to do with the further question, whether the partnership was continued after the death of L. Rex Peters. Long after that event, Jacob acknowledged his liability to account to his brother's estate, and his willingness to pay whatever might be found to be justly due. He agreed to a reference, and delivered over the books of the concern to the referees for that purpose. He agreed to a second reference, after the first had fallen through. L. Rex Peters had died in 1857, and by the references the matter was continued open until November 17th 1865. During all this period Jacob was, either expressly or impliedly, declaring his entire willingness to account, and it was not until he was dissatisfied with the result of the last reference, and revoked the authority of the arbitrators, that he said " that, if suit was brought, he believed he would contend that the sheriff's sale vested the whole title of the partnership in him." But a pending reference to ascertain the balance of account between partners is a continuing admission of a liability to account, of the most unequivocal kind, sufficient to suspend the running of the statute, and to preclude any denial of partnership. After a party has been delayed for six years by such a reference or references, it would be highly inequitable to allow his opponent to turn round and either deny all liability to account, or that he is barred of his remedy by lapse of time.

> Decree reversed, and now it is ordered that the defendant, Jacob Peters, do, as surviving partner, account to the plaintiff, the administratrix of L. Rex Peters, and that it be referred to E. Coppee Mitchell, Esq., as master, to state and report such account, and the balance which may appear thereon.